IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
TOPEKA DIVISION

UNITED STATES OF AMERICA )          Case No.: 5:15-cr-40030-JWL
Plaintiff,                )
                          )
v.                        )
                          )
JOHN T. BOOKER, Jr,       )
Defendant Pro Se,         )

### Defendant's Rebuttal to Government's Response

Defendant, John T. Booker, Jr., comes before this Honorable Court to present rebuttal to the government's response to his motion for Reduction of Sentence

### I. Relevent History

1. In addition to the procedural history documented in the ECF DOC.98 and 101, said documents were filed on June 8th and 10th, 2026, re received by certified mail on June 17, 2026, and submits rebuttal.

### II. Argument

2. The Government asserts several facts, some of which Defendant Contests or wishes to clarify.

3. The Government asserts that Defendant believes immediate release is warranted based on modern sentencing trends, renunciation of terrorism, and rehabilitation. Defendant does believe so, but wishes to remind the Court that the request is left very open to "Time served or whatever this Court deems appropriate. "ECF Doc. 98 at *1.

4. The Government asserts that Defendant must meet three requireements for the Court to exercise its discretion to reduce a sentence, and since Defendant has not, that this Court "must" deny this motion. These requirements are: (1) there are extraordinary and compelling reasons that support the requested sentence reduction; (2) the

1

reduction is consistent with the applicable policy statements issued by the United States Sentencing Commission; and (3) the district Court considers the factors set forth in 18 U.S.C. §3553(a). The Government further cites the recent <u>Rutherford</u> and <u>Fernadez</u> decisions by the Supreme Court, in that "extraordinary and compelling reasons for compassionate release are those that are especially unusual and convincing," and that "the design of Congress in amending [section] 3582(c)(1)(A) was not to create open season for resentencing. "ECF Doc. 101 at *4 and 5.

5. Defendant rebuts that the Supreme Court has granted this Court wide discretion in reduction of sentence, or compassionate release. "The First Step Act allows district courts to consider intervening changes of law or fact in exercizing their discretion  to reduce a sentence. . "<u>Concepcion v. United States</u>, 597 U.S. 481 (June 27, 2022) at *482. "Federal Courts historically have exercised broad discretion to consider all relevent information at an initial sentencing hearing, consistent with their responsibility to sentence the whole person before them. That discretion also carries forward to later proceedings that may modify an original sentence. District Court's discretion  is bounded only when Congress or the Constitution expressly limits the type of information a district court may consider in modifying a sentence." Id at *482." The discretion federal judges hold at initial sentencing also characterizes sentencing modification hearings. The court in <u>Pepper v. United States</u>, 562 U.S. 476, found it 'clear that when a defendant's sentence has been set aside on appeal and his case remanded for resentencing, a district court may consider

2

evidence of a defendant's rehabilitation since his prior sentencing, id at *490. Accordingly, federal courts resentencing individuals whose sentences were vacated on appeal regularly consider evidence of rule breaking in prison, developed after the initial sentencing. Where district court's must calculate new Guidelines ranges as part of resentencing proceedings, courts have also exercised their discretion to consider nonretroactive Guidelines changes. In some cases a district court's prohibited from recalculating a Guidelines ranges to account for nonretroactive Guidelines amendments, but the court may nevertheless find those amendments to be germane when deciding whether to modify a sentence at all, and if so, to what extent.'" Id at *482-483.

6. The Government asserts that because Amendment 829 is nonretroactive and because Amendment 836 deleted U.S.S.G. §5H1.1, that it cannot meet the standard of extraordinary and compelling circumstances pursuant U.S.S.G. §1B1.13(b)(6). The Government was silent on the evolving sentencing trends cited in ECF Doc. 98, paragraphs 11-13, which do constitute substantial downward variance resulting from the youthful aspect of the defendant, and a departure from a categorical approach to sentencing enhancements involved with terrorism related offences. The Government correctly reminds the Court that U.S.S.G §1B1.13(d) cannot be extraordinary and compelling by itself, but does applaud Defendant's rehabilitation.

7. Defendant asserts in ECF Doc. 98, paragraph 10, that the Montgomery decision supports the retroactivity of U.S.S.G. §5H1.1. Defendant also included a myriad of scientific findings and decisions providing information that was not considered at initial sentencing, and now

3

contends that even if §5H1.1 is repealed, the science, facts, and rather verbose decisions applying such logic has been neither repealed nor disputed. Defendant must beg a bit of grace from the Government and this Court as to Amendment 836, The Bureau of Prisons has not updated the Electronic Law Library since prior to Nov 1, 2025, and so Defendant cannot view such changes. Even though Amendment 836 had  the purpose to " simplify  the guidelines," the U.S.S.C. is proposing mitigation based on defendant vulnerability to U.S.S.G. §2B1.1(b)(3). This is clear  evidence that the Sentencing Commission still has downward variances and relief in mind, and consideration for the science  regarding groups like youthful offenders.

9) The Government does not oppose Defendant's assertion of rehabilition, nor does it oppose his claim to be no danger to any person, or the community. The Government does however project Defendant to be a well thought out and thoroughlyplanned attempted mass murderer who should not be regarded for any leniency. Defendant wishes to review relevent facts to the court regarding his involvment and mental state.

10. " In March of 2014, Mr.Booker posted a message on FaceBook threatening to  'wage jihad.' He was visited by the FBI, and the FBI took Mr.Booker to a hospital in Topeka,Kansas, for an evaluation of his mental health. The hospital diagnosed Mr.Booker with Bipolar I disorder, most recent episode manic,  severe.' A manic episode may manifest itself  as 'grandiosity [of] delusional proportions,' racing throughts, obsessive involvement in religious or political activities, extremely poor judgment, and physically assaultive, suicidal, or other

otherwise antisocial behavior. The hospital that the FBI selected for Mr.Booker opined that Mr.Booker's Bipolar I disorder had caused him to become 'increasingly zealous, and also increasingly agitated, reactive, and impulsive in his actions.' (During an earlier episode, Mr.Booker had bec[o]me infatuated with catholicism, its rules, and its rituals, and expressed a desire to become a priest.) The hospital began administering an antipsychotic, but the drug did not adequately control Mr.Booker's symptoms and caused significant side effects. Eventually, Mr.Booker stopped taking the medication. In late 2014 and early 2015, two unidentified persons working for the FBI encouraged Mr.Booker to plan a terrorist attack on a local military base. Mr.Booker first met the FBI operative, posing as a jihadist in October 2014. Mr.Booker expressed an inchoate desire to join a terrorist group or engage in a terrorist attack, and the FBI operative prodded Mr.Booker to watch an ISIS propaganda film, 'The Flames of War,' designed to recruit Westerners. Mr.Booker lacked firm plans to act on his jihadist sympathies and told the FBI operative, 'Anything you think is good. I will follow you.' The FBI operative told Mr.Booker that he 'would have to prove' that he was ready to fight. After Mr.Booker failed to do anything for six months despite encouragement from the FBI operative, the FBI operative chastized Mr.Booker for his 'lack of follow though and constant changing of ideas.' Mr.Booker said he [wa]s willing to support any plan the [FBI operative] want[ed] to do.' The FBI operative introduced Mr.Booker to a second FBI operative, who the first operative said was 'a higherranking sheik planning terrorist acts in the United States. 'The second operative further encouraged Mr.Booker, and Mr.Booker said that he would do anything

5

[the operative] asked him to do.' A few weeks later, the FBI operative told Mr.Booker that they had been 'selected' for a suicide mission and 'provided Booker with a list of supplies that they needed to purchse in order to build [a] bomb.' Together, the FBI operative and Mr.Booker purchased the items. In reality, the items were inert and could not be used to build a bomb. 'Booker asked what their next task would be and [the FBI operative] told him to prepare and be ready, and [the operative] would return in about two weeks.' In April 2015, the two FBI operatives built the fake bomb, and one of the operatives drove Mr.Booker and the fake bomb to Kansas military base. Once Mr.Booker arrived at the base, the FBI arrested him.' United States v. Booker, Case No. 17-3167, Doc. 01019907961, at *11-13 (10th. Cir., 2017),(internal citations omitted).

11. Viewed in this light, Defendant was a youthful offender who was diagnosed with Bipolar I disorder, was not compliant with medication, and had a great amount of assistance and guidance, even prodding, from FBI operatives. Defendant had an attemped crime, without any explosive device, victims, or damages, This does not diminish the heroism of the operatives nor the heinous nature of what may have happened. It does remind this court that Defendant was not in his right mind, and reinforces that he was not mature enough to avoid the impulsive and flawed decision making of an underdeveloped prefrontal cortex. The Government reminded the Court of his tirade of sovereign citizen ideology at sentencing , Defendant reminds the Court the he was frantic and nigh unintelligible to the extent that no stenographer could transcribe it. Defendant is still ashamed at all

of this conduct, and of his youthful and manic obsession with ridiculous ideologies at that time.

12. This Court has already granted compassionate release for combinations of factors, including youth, which constitute extraordinary and compelling reasons. "Further, the law has changed with respect to the law's recognition of the relationship between youth and culpability. Under current law, it is understood that 'young people are less mature, are more reckless and impulsive, are more vulnerable to surrounding influence, lack the ability to control their lives and surroundings, and have characters that are less fixed and more amenable to change, all of which makes irrevocable sentences like mandatory life inappropriate in many cases.' Here, defendant was only 18 when he  was involved in the robbery that led to the  horrible death of Mrs.Sun. Defendant's family history is set forth in his brief and shows he had difficulty fitting in as a young immigrant. Defendant dropped out of school in the ninth grade after missing a significant number of days as a middle schooler... Defendant began using drugs to fit in and was using drugs at the time of the offense.' United States v. Kayanath, 2024 U.S. Dist. LEXIS 39674 (D.KS.2024), at *9-10 (internal citations omitted). "Defendant asserts that the catchall provision, the Court has discretion to find extraordinary and compelling reasons based on 'any other circumstances or combination of circumstances that when considered  by themselves are similar in gravity to the circumstances described in those four categories.' U.S.SGG. §1B1.13(b)(5). The Government

7

argues that the Defendant's cricumstances are not similar in gravity to the circumstances set forth in the first four categories. Those circumstances are 'quite limited' and the Sentencing Commission 'considered but specifically rejected a requirement that other reasons [under subsection (5) must] be similar in nature and consequence to the specified reasons' in the first four subsections." Id at *12-13. "Courts have been granting sentence reductions on 'dozens of reasons and combinations of reasons' and it is clear that the Commission did not intend to significantly restrict the Court's discretion to determine what constitutes extraordinary and compelling reasons." Id at *13 (internal citation omitted).

13. Defendant reminds the Court that he would still be under lifetime supervision if released. He would be supported by and staying with his father, a Gulf War Veteran. He will continue seeking mental health treatment. He is fully rehabilitated, no longer supports radical Islam that he was brainwashed into, nor does he practice that faith at all, and poses no danger to any person or the community.

14. Though it would be rather unorthodox in a §3582 motion, Defendant would be willing to appear before this Court, if so requested, so that the Court could assess first-hand that Defendant is an entirely diffrent man than the one who was sentenced. Defendant is confident that the difference would make it apparent that, similar to Kayanath, though the guidelines still call for, a very long sentence of 30 years

8

serves no penological purpose, and therefore should be reduced.

III. Conclusion

For the reasons stated above, Defendant asserts that he does meet extraordinary and compelling circumstances by combination, that a reduced sentence is consistent with applicable policy and §3553(a) factors, and that this Court can and should reduce his sentence.

Respectfully submitted on this ___2__ day of_July_____,2026

Shelby County,Tennessee.

John T, Booker,Jr #25124-031

FCI Memphis

P.O. Box 34550

Memphis,TN,38184

9